In the Matter of County of Suffolk, Petitioner, v Paul L. Gioia et al., Respondents. (Proceeding No. 1.)

In the Matter of Long Island Farm Bureau, Inc., Petitioner, v Paul L. Gioia et al., Respondents. (Proceeding No. 2.) ·

Second Department, November 7, 1983

APPEARANCES OF COUNSEL

*Twomey, Latham & Shea, (John F. Shea, III,* and *Stephen B. Latham* of counsel), for Long Island Farm Bureau, Inc., petitioner.

*David J. Gilmartin, County Attorney (Patricia A. Dempsey* of counsel), for County of Suffolk, petitioner.

*Kathy A. Bennett* for New York State Consumer Protection Board, *amicus curiae.*

*David E. Blabey (Lawrence G. Malone* of counsel), for State of New York Board on Electric Generation Siting and the Environment, respondent.

*Edward M. Barrett (Jeffrey L. Futter* of counsel), for Long Island Lighting Company, respondent.

### OPINION OF THE COURT

*Per Curiam.*

The instant proceedings arise out of the application for a certificate of environmental compatibility and public need, originally filed in 1974, pursuant to former article 8 of the Public Service Law. In 1978, former article 8 of the Public Service Law was repealed in its entirety, and was superseded by the present version (see L 1978, ch 708, § 2). With respect to applications filed pursuant to former article 8 of the Public Service Law, chapter 708 (§ 3, subd [ii]) of the Laws of 1978 provides that: "any board decision * * * shall be reached within eighteen months of the effective date of this act [August 4, 1978], provided however that the board may waive the deadline in order to give consideration to specific issues necessary to develop an adequate record". Under the particular set of circumstances presented here, the siting board's failure to comply with this subdivision divested it of jurisdiction over the application.

### THE FACTS

On April 22, 1974, the Long Island Lighting Company (LILCO) applied for a certificate of environmental compatibility and public need for two 1150-megawatt nuclear-fueled generating facilities, to be built near the Hamlet of Jamesport in the Town of Riverhead, New York. In 1976, the application was amended to make New York State Electric and Gas Corporation (NYSE & G) a coapplicant and equal partner in the project. After voluminous hearings, the New York State Board on Electric Generation Siting and the Environment (Siting Board) issued an "opinion and Order" on September 8, 1980, authorizing

LILCO and NYSE & G to build one 800-megawatt coal-fueled electric generating facility.

Thereafter, the applicants petitioned for a rehearing, on the grounds, *inter alia,* that LILCO was reluctant "to commit substantial resources to a new coal project until there is reasonable assurance it will not be required to convert its Northport plant to coal". Petitioners Long Island Farm Bureau, Inc., and County of Suffolk also petitioned for a rehearing. On December 3, 1980, the Siting Board issued an "Order Granting in Part LILCO's Petition for Rehearing". The applicants' deadlines for accepting the certificate of environmental compatibility and public need, and for filing additional submissions pursuant to that certificate, were extended. In an order dated April 29, 1981, petitioners' requests for a rehearing were denied.

The applicants' deadline for accepting the certificate was extended from August 27, 1981 to October 27, 1981. Thereafter, by letter dated October 27, 1981, NYSE & G informed the Siting Board and all parties that it "has decided to terminate its participation in the Jamesport project", because "other alternatives for meeting the capacity demands of its customers appear more attractive". Nevertheless, LILCO attempted to accept the certificate, subject to the following understandings:

"(1) LILCO will seek other partner(s) to participate in a Jamesport coal-fired unit of up to 800 MW in size.

"(2) LILCO will restudy the optimum size of Jamesport, with and without partner(s), and will report the results of its studies to the Siting Board.

"(3) LILCO will restudy the optimum year of completion of Jamesport, with and without partner(s), and will report those results to the Siting Board."

By order issued March 15, 1982, the Siting Board rejected LILCO's purported acceptance of the certificate. In so doing, the Siting Board noted: "The certificate was issued to the two companies jointly, and LILCO alone may not accept it, in its present form, conditionally or otherwise." The Siting Board gave LILCO an additional year, until March 15, 1983, to submit its proposed disposition of the matter, and noted that "[u]pon receiving LILCO's proposal we shall determine what further proceedings — including,

if necessary hearings — are required before it may be acted on". By letter dated March 11, 1983 LILCO tentatively requested rescission of the certificate but asked that any action in that respect be "suspended" until LILCO was certain that the Shoreham Nuclear Power Plant could be put in operation.

RELEVANT STATUTORY PROVISIONS

The administrative mechanism of a Siting Board was established in 1972 "to provide for the expeditious resolution of all matters concerning the location of major steam electric generating facilities * * * in a single proceeding * * * to which access will be open to citizens, groups, municipalities and other public agencies to enable them to participate in these decisions" (L 1972, ch 385, § 1). Effective August 4, 1978, article 8 of the Public Service Law was repealed in its entirety, and superseded by the present version (see L 1978, ch 708, § 2). In so doing, the Legislature declared in part (see L 1978, ch 708, § 1):

"In nineteen hundred seventy-two, article eight of the public service law was enacted to provide for the expeditious siting of major steam electric generating facilities. That law was intended to balance in a single proceeding, the people's need for electricity and their environmental concerns. Prior to article eight, requirements for a multiplicity of governmental licenses and permits resulted in delays in new construction of such facilities and very substantial cost increases were passed on to electric consumers throughout the state.

"It is the legislature's intention by these amendments to (a) establish a strict time schedule within which any hearing must be conducted and a determination reached and (b) provide for a procedure whereby the focus of a hearing may be directed to those issues which are essential for the board to reach a decision granting or denying a certificate."

Simultaneously therewith, the Legislature enacted certain transition provisions for applications filed pursuant to former article 8 of the Public Service Law and still pending on the effective date of the present version (see L 1978, ch 708, § 3). These provisions state, in pertinent part: "(ii) any board decision with respect to an application filed pursuant to the provisions of article eight as added by said chapter

three hundred eighty-five shall be reached within eighteen months of the effective date of this act, provided however that the board may waive the deadline in order to give consideration to specific issues necessary to develop an adequate record, and (iii) any board's jurisdiction over any such application filed pursuant to the provisions of article eight as added by said chapter three hundred eighty-five shall cease following any rehearing or any judicial review of the board's decision and order, and the public service commission shall monitor, enforce and administer compliance with any terms or conditions set forth in such board decision and order."

With respect to new applications, the application fee was raised from $25,000 to $150,000, "to establish a fund * * * to be disbursed at the board's direction, to defray expenses incurred by municipal and other local parties to the proceeding * * * for expert witness and consultant fees" (see Public Service Law, § 142, subd 6, par [a]).

### THE TIMELINESS OF THE SITING BOARD'S DECISION

Petitioners contend that, pursuant to chapter 708 (§ 3, subd [ii]) of the Laws of 1978, the Siting Board's jurisdiction over the application terminated on February 4, 1980, 18 months after the effective date of chapter 708 of the Laws of 1978. In support of this contention, petitioners cite the Legislature's declaration that it was their intention "to * * * establish a strict time schedule within which any hearing must be conducted and a determination reached" (see L 1978, ch 708, § 1). It is apparent, however, that the Legislature intended to establish a strict time schedule to reduce "delays in new construction" (L 1978, ch 708, § 1), and not to inhibit new construction. Moreover, the question of whether a time requirement applicable to a governmental agency is directory rather than mandatory depends on whether the requirement "may be said to be an 'unessential particular' * * * or, on the other hand, relates to the essence and substance of the act to be performed" (see *Matter of King v Carey*, 57 NY2d 505, 513). In this instance, the Legislature expressly indicated that the time requirement does not relate to the essence and substance of the act to be performed when it provided that "the board may waive the deadline in order to give consideration to

specific issues necessary to develop an adequate record" (L 1978, ch 708, § 3, subd [ii]). Therefore, the 18-month deadline should be deemed directory and not mandatory (see *Matter of Grossman v Rankin,* 43 NY2d 493, 501).

Nevertheless, an administrative agency's noncompliance with directory time schedules may operate to divest it of jurisdiction, if there is a showing of "substantial prejudice" (see *Matter of Sarkisian Bros. v State Div. of Human Rights,* 48 NY2d 816, 818; *Union Free School Dist. No. 6 v New York State Human Rights Appeal Bd.,* 35 NY2d 371, 380-381). In this instance, the delay has been extensive. The Siting Board acknowledges that LILCO, as sole remaining applicant, may not accept the certificate, "in its present form, conditionally or otherwise". Thus, the certificate is useless in its present form. The Siting Board urges that "[i]f LILCO obtains another partner, NYSEG's responsibilities under the certificate can be transferred to that partner" (see Public Service Law, § 141, subd 2). Further, the Siting Board urges that "[i]f LILCO instead desires to build a smaller plant, it will have to propose an amendment to the certificate, which would require further proceedings by the Board" (see Public Service Law, § 141, subd 3). However, the Siting Board acknowledges that "[b]oth certificate transfers and certificate amendments necessarily involve modifications of an original application". Thus, the application must be modified before a certificate may issue in a form which LILCO could accept. Five years after the effective date of chapter 708 of the Laws of 1978, the Siting Board has yet to reach a final decision with respect to that application.

By extending the proceedings before the Siting Board indefinitely, LILCO has avoided the necessity of filing a new application, and payment of a new application fee of $150,000. As a result, petitioners have suffered prejudice, because they have been deprived of funds to contest the application (see Public Service Law, § 142, subd 6, par [a]).

Moreover, the extension of the proceedings before the Siting Board violates the apparent legislative intent of chapter 708 (§ 3, subd [ii]) of the Laws of 1978. As of this date LILCO has not decided whether it will proceed with a partner, or alone, nor whether it will build a 400-megawatt

plant, or an 800-megawatt plant. Indeed, the Siting Board waived the 18-month deadline without knowing what specific issues must be considered to develop an adequate record. The broad-sweeping inquiry contemplated here is tantamount to a new application, and should be presented as such.

CONCLUSION

For the aforesaid reasons the Siting Board has lost jurisdiction over the application, and has no authority to issue a new certificate with respect to that application. The certificate issued pursuant to the Siting Board's opinion and order dated September 8, 1980 is admittedly useless in its present form. Therefore, the determination should be annulled, and the application dismissed.

TITONE, J. P., BRACKEN, RUBIN and BOYERS, JJ., concur.

Petitions granted to the extent that the determination of the New York State Board on Electric Generation Siting and the Environment, dated September 8, 1980, is annulled, on the law, without costs or disbursements, and the application is dismissed.