Matter of Town of Copake v New York State Off. of Renewable Energy Siting (2023 NY Slip Op 02721)

Matter of Town of Copake v New York State Off. of Renewable Energy Siting

2023 NY Slip Op 02721

Decided on May 18, 2023

Appellate Division, Third Department

Pritzker, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:May 18, 2023

534318 534413

[*1]In the Matter of Town of Copake et al., Appellants, et al., Petitioner,
v
New York State Office of Renewable Energy Siting et al., Respondents, et al., Respondents.

Calendar Date:March 27, 2023

Before: Aarons, J.P., Pritzker, Reynolds Fitzgerald and McShan, JJ.

Law Office of Gary A. Abraham, Great Valley (Gary A. Abraham of counsel) and Wisniewski Law PLLC, Webster (Benjamin E. Wisniewski of counsel), for appellants.
Letitia James, Attorney General, Albany (Lucas C. McNamara of counsel), for New York State Office of Renewable Energy Siting and others, respondents.
Young/Sommer LLC, Albany (J. Michael Naughton of counsel), for Alliance for Clean Energy New York, Inc., respondent.
Arnold & Porter Kaye Scholer LLP, New York City (Michael B. Gerrard of counsel) and Sabin Center for Climate Change Law, New York City (Matthew Eisenson of counsel), for Friends of Flint Mine Solar and others, amici curiae.
Natural Resources Defense Council, New York City (Jay Cullen Howe of counsel), for Natural Resources Defense Council and others, amici curiae.

Pritzker, J.
Appeals (1) from an order of the Supreme Court (Peter A. Lynch, J.), entered September 22, 2021 in Albany County, which, in a combined proceeding pursuant to CPLR article 78 and action for declaratory judgment, denied petitioners' motion for a preliminary injunction, and (2) from a judgment of said court, entered October 8, 2021 in Albany County, which dismissed petitioners' application, in a combined proceeding pursuant to CPLR article 78 and action for declaratory judgment, to review certain regulations promulgated by respondent Office of Renewable Energy Siting.
In 2019, the Legislature established the New York Climate Leadership and Community Protection Act (hereinafter CLCPA); this act amended the Environmental Conservation Law, Public Service Law, Public Authorities Law, Labor Law and the Community Risk and Resiliency Act in an effort to address the imminent risks of climate change (see L 2019, ch 106). Inasmuch as the CLCPA set forth a rigorous schedule to achieve zero emissions of electrical energy by 2040 (see Public Service Law § 66-p [2] [b]), the Legislature enacted the Accelerated Renewable Energy Growth and Community Benefit Act (see L 2020, ch 58, part JJJ), which, as is relevant here, added Executive Law § 94-c. This statute created respondent Office of Renewable Energy Siting (hereinafter ORES), an entity whose purpose is to "undertake a coordinated and timely review of proposed major renewable energy facilities to meet the state's renewable energy goals while ensuring the protection of the environment and consideration of all pertinent social, economic and environmental factors" (Executive Law § 94-c [1]). Essentially, Executive Law § 94-c sought to consolidate the environmental review process into a single forum for said renewable energy facilities (see L 2020, ch 58, part JJJ, § 4; Executive Law § 94-c [1]). Executive Law § 94-c effectively replaced article 10 of the Public Service Law, the predecessor and exclusive forum regulating the siting of such facilities. Notably, pursuant to ECL 8-0111 (5) (b), actions subject to Public Service Law article 10 were exempt from the requirements of the State Environmental Quality Review Act (see ECL article 8 [hereinafter SEQRA]). After the creation of Executive Law § 94-c and ORES, the Legislature retroactively amended ECL 8-0111 (5) (b) to make the exemption applicable to siting permits issued under Executive Law § 94-c (see L 2021, ch 55, part BBB, § 1).
Executive Law § 94-c has created an entirely new regime to review the environmental impacts of large renewable energy projects independent of SEQRA (see Executive Law § 94-c [3], [5]). To that end, mechanisms were put in place to override or waive certain local laws that were found to be "unreasonably burdensome" in light of the goals of the CLCPA (Executive Law § 94-c [5] [e]). ORES was empowered to promulgate regulations to establish a set of uniform standards and conditions (hereinafter USCs) for various stages of such projects[*2](see Executive Law § 94-c [3] [b], [g]). Additionally, Executive Law § 94-c (5) (f) includes a default provision that sets a one-year time frame for reviewing applications. If a final decision has not been made within this time frame, the application is "automatically granted" with uniform conditions or site-specific permit conditions (Executive Law § 94-c [5] [f]) — this time frame was then incorporated into the regulations (see 19 NYCRR 900-9.1 [a] [2]). ORES published notices respecting the proposed rulemaking, held public hearings, solicited public comments and reviewed such. Although the siting of renewable energy facilities was exempt from SEQRA review, because regulation promulgation requires a SEQRA review (see ECL 8-0105 [4] [ii]), ORES conducted such. Thereafter, ORES designated the action as unlisted pursuant to SEQRA and issued a short environmental assessment form (hereinafter EAF). After concluding that the regulations themselves would not cause significant adverse impacts, ORES issued a negative declaration and did not prepare an environmental impact statement (hereinafter EIS). The regulations became effective in March 2021 (see 19 NYCRR part 900).
In June 2021, petitioners — who include numerous municipalities, municipal corporations and private entities — commenced the instant combined proceeding pursuant to CPLR article 78 and action for declaratory judgment, seeking, among other things, to annul the regulations and direct ORES to engage in a proper SEQRA review. Specifically, petitioners alleged that, among other things, ORES: (1) mischaracterized the action as an unlisted action rather than a type I action; (2) failed to take a hard look at the environmental consequences of the regulations; (3) violated the home rule provision of the NY Constitution; and (4) violated the express terms of Executive Law § 94-c. Prior to joinder of issue, petitioners moved for a preliminary injunction, which Supreme Court denied. Thereafter, ORES and respondents Executive Director of ORES, Department of State and John Does 1-20 answered the petition/complaint. Respondent Alliance for Clean Energy New York moved to intervene, which motion Supreme Court granted, and answered the petition/complaint. After Supreme Court denied the preliminary injunction, it dismissed the petition/complaint on the merits and incorporated the analysis provided in its prior decision. Preliminarily, the court determined that the action was properly classified as unlisted. It further determined, among other things, that a negative declaration was appropriate, given that the regulatory scheme provided a more comprehensive review than SEQRA itself. More specifically, the court found that ORES had taken a hard look at the potential for adverse environmental impacts that might occur based on the imposition of a default provision within the regulations. Petitioners appeal from the order denying their motion for a preliminary injunction,[FN1] as well as from the judgment dismissing [*3]the petition/complaint.
To begin, we agree with petitioners' threshold argument that ORES misclassified this action as unlisted, rather than type I. Preliminarily, regarding the proper designation, Supreme Court focused on the incorrect stage of the SEQRA analysis — namely, whether environmental impacts were speculative. The court reasoned that there were no actual plans before it, so none of the subsections of 6 NYCRR 617.4 (b) could apply. However, the "actual plan" was the regulations themselves, which were acknowledged as requiring the SEQRA process (see 6 NYCRR 617.2 [b] [3]).[FN2] When reading both 6 NYCRR 617.2 and 617.4 together, the promulgation of regulations is clearly not intended to be excluded from type I action designation. Moreover, given that the regulations authorize the siting of massive renewable energy facilities, the regulations will alter agricultural property, which also necessitates classification as a type I action (see 19 NYCRR part 900; 6 NYCRR 617.4). Therefore, the promulgation of the regulations should have been classified as a type I action that would carry the presumption of requiring preparation of an EIS (see 6 NYCRR 617.4 [a]; Matter of Hudson Val. Hous. Dev. Fund Co., Inc. v County of Ulster, 183 AD3d 974, 976 [3d Dept 2020], lv denied 37 NY3d 901 [2021]; Matter of Gabrielli v Town of New Paltz, 116 AD3d 1315, 1316 [3d Dept 2014]). However, "a misclassification does not always lead to the annulment of the negative declaration if the lead agency conducts the equivalent of a type I review notwithstanding the misclassification" (Matter of Williamsville Residents Opposed to Blocher Redevelopment, LLC v Village of Williamsville Planning & Architectural Review Bd., 208 AD3d 1609, 1610 [4th Dept 2022]; compare Matter of Miranda Holdings, Inc. v Town Bd. of the Town of Orchard Park, 206 AD3d 1662, 1663-1664 [4th Dept 2022], lv dismissed 39 NY3d 937 [2022]), and, notably, "a type I action does not, per se, necessitate the filing of an EIS" (Matter of Brunner v Town of Schodack Planning Bd., 178 AD3d 1181, 1182 [3d Dept 2019] [internal quotation marks and citations omitted]). Indeed, even where the action is classified as a type I action, the lead agency can issue a negative declaration where it determines that there will be no adverse environmental impacts (see id.; Matter of Gabrielli v Town of New Paltz, 116 AD3d at 1316).
Aside from the mischaracterization of the action as unlisted, petitioners also argue that since the regulations may have a significant adverse impact on the environment, a positive declaration should have been issued and an EIS should have been prepared, noting that ORES was required, but failed, to consider subsequent actions and whether there would be an impact. In this regard, petitioners assert that it was inappropriate to defer or segment the assessment of the environmental impacts to the individualized permit application review process and this demonstrated that ORES failed to take a hard look [*4]at the regulations' potential for adverse environmental impacts. It is well settled that "[j]udicial review of an agency determination under SEQRA is limited to whether the lead agency identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis for its determination. The court's role is not to second-guess the agency's determination" (Matter of Brunner v Town of Schodack Planning Bd., 178 AD3d at 1183 [internal quotation marks and citations omitted]; see 6 NYCRR 617.7 [b]; Matter of Heights of Lansing, LLC v Village of Lansing, 160 AD3d 1165, 1166 [3d Dept 2018]). Generally, "[a] negative declaration may be issued, obviating the need for an EIS, if the lead agency . . . determines that 'no adverse environmental impacts will result or that the identified adverse environmental impacts will not be significant' " (Matter of Gabrielli v Town of New Paltz, 116 AD3d at 1316 [brackets omitted], quoting 6 NYCRR 617.7 [a] [2]; see Matter of Brunner v Town of Schodack Planning Bd., 178 AD3d at 1182). With that being said, 6 NYCRR 617.7 (c) (1) provides a nonexhaustive list of "indicators" to assess whether proposed type I and unlisted actions may have a significant adverse impact on the environment. Examples of such include substantial changes in noise levels, impacts to natural resources and wildlife, material conflicts with a community's plans or goals, a major change in the use of either the quantity or type of energy and the creation of hazards to human health, among other things (see 6 NYCRR 617.7 [c] [1] [i], [ii], [iv], [vi], [vii]).
"A lead agency need not investigate every conceivable environmental problem during the course of SEQRA review, and generalized community objections or speculative environmental consequences are not sufficient to establish a SEQRA violation" (Matter of Heights of Lansing, LLC v Village of Lansing, 160 AD3d at 1167 [internal quotation marks and citations omitted]). Further, "[a] lead agency improperly defers its duties when it abdicates its SEQRA responsibilities to another agency or insulates itself from environmental decision[-]making" (Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219, 234 [2007]; see Matter of Bergami v Town Bd. of the Town of Rotterdam, 97 AD3d 1018, 1021-1022 [3d Dept 2012]). With that being said, "a lead agency without environmental expertise to evaluate a project may rely on outside sources and the advice of others in performing its function" (Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd., 253 AD2d 342, 350 [4th Dept 1999]), so long as the lead agency "exercise[s] its own judgment in determining whether a particular circumstance adversely impacts the environment" (Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d at 234). As noted above, "[a]ctions subject to the provisions requiring a certificate of environmental compatibility and public need in article[] [*5]. . . [10] . . . of the [P]ublic [S]ervice [L]aw or requiring a siting permit under [Executive Law § 94-c]" are exempt from SEQRA review (ECL 8-0111 [5] [b]).
A review of the vast record reveals that ORES took a thorough and hard look at the potential negative environmental impacts associated with the proposed regulations. To that end, after completion of the short EAF, draft regulations and USCs were issued, and the public was provided notice of such. Significantly, seven public hearings were held, and numerous public comments were submitted as well, to which ORES responded extensively. Among other things, ORES identified permitting conditions that were necessary to ensure adverse environmental impacts were avoided or minimized, which made the ORES review similar to that under SEQRA. Further, ORES noted that such projects had been exempted from SEQRA under the prior Public Service Law article 10 process. With respect to "potential cumulative environmental impacts," ORES stated that Executive Law § 94-c required that it consult with other agencies in conjunction with the development of the regulations. In conducting a SEQRA review of the regulations, ORES considered the environmental reviews conducted by the Board on Electric Generation Siting and the Environment (hereinafter Siting Board), which was conducted for the implementation of Public Service Law article 10, the Large-Scale Renewable Program and Clean Energy Standard and the Climate Leadership and Community Protection Act, among other proceedings.
ORES then issued an amended short EAF in which the name of the action was changed, ORES providing a more robust explanation of the proposed action, its authority to promulgate such regulations and the determination of significance. ORES also included the impacts of the regulations as an attachment. In this respect, ORES noted that the adoption of the USCs advanced the statutory purposes of Executive Law § 94-c and public policy respecting the "establishment of a timely and cost-effective siting process for proposed major renewable energy facilities." The USCs would be incorporated into draft permits issued by ORES for public comment, but it noted that ORES was responsible for developing site-specific terms and conditions to avoid adverse environmental impacts that were not addressed by the USCs. The procedural regulations also advanced the statutory purposes by expediting the regulatory review of applications for the siting of such facilities — this was necessary for the CLCPA targets. The regulations allowed for public engagement as early as the pre-application process and avoided or minimized significant adverse impacts to the environment. Importantly, it was noted that this action did not include any direct approval of applications for any facilities — it simply set forth substantive and procedural requirements for the permitting process. For this reason, ORES stated that the action would not have any adverse environmental impacts because [*6]each application would be independently reviewed.
Based on the totality of such, ORES issued a negative declaration. In doing so, ORES evaluated and incorporated prior SEQRA determinations. As demonstrated by the responses to public comments, ORES considered all public comments and their relation to each subdivision specifically, as well as responded to general comments when determining that there would be no significant adverse environmental impacts based on the promulgation of the regulations (see 6 NYCRR 617.7 [a] [2]; Matter of Brunner v Town of Schodack Planning Bd., 178 AD3d at 1183-1184; Matter of Gabrielli v Town of New Paltz, 116 AD3d at 1316-1317). While it is true that petitioners alleged that many adverse environmental impacts that may be present in specific projects were not considered that would necessitate an EIS (see 6 NYCRR 716 [c] [1] [i], [ii], [iv], [vi], [vii]), ORES responded to such concerns and provided an explanation of its rationale and explained why there would be no adverse impacts or why no change was warranted (see Matter of Brunner v Town of Schodack Planning Bd., 178 AD3d at 1183-1184; Matter of Heights of Lansing, LLC v Village of Lansing, 160 AD3d at 1166-1167). Further, ORES noted that it conferred with other agencies, which was proper (see Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd., 253 AD2d at 350), given that they had expertise on the matter (see Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d at 234; Matter of Bergami v Town Bd. of the Town of Rotterdam, 97 AD3d at 1021-1022). Ultimately, with the help of a consultant, Tetra Tech, these regulations were promulgated based on the advice of experts (see Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast,9 NY3d at 234).[FN3] Although Supreme Court took issue with reliance on prior EISs, this was another example of relying on outside sources with expertise in the matter (see Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd., 253 AD2d at 350).
As it specifically related to the default provision, again, ORES provided a reasoned explanation for why the time frames were appropriate — namely, that ORES was confined by Executive Law § 94-c, which was not being challenged (see 6 NYCRR 617.7 [a] [2]; Matter of Brunner v Town of Schodack Planning Bd., 178 AD3d at 1182; Matter of Gabrielli v Town of New Paltz, 116 AD3d at 1316). Inasmuch as all other concerns revolved around some future speculative problem that could arise, these concerns could not form the basis of a SEQRA violation (see Matter of Heights of Lansing, LLC v Village of Lansing, 160 AD3d at 1167). Further, these plans were expressly exempted from SEQRA review, so considering concerns respecting any specific project would have been inappropriate (see ECL 8-0111 [5] [b]). Accordingly, it was properly determined that the need for an EIS was obviated (see 6 NYCRR 617.7 [a] [2]; Matter of Brunner v Town of Schodack Planning [*7]Bd., 178 AD3d at 1184; Matter of Gabrielli v Town of New Paltz, 116 AD3d at 1317). As such ORES, did not violate SEQRA in rendering its negative declaration.
Next, we address petitioners' assertions that ORES exceeded its statutory authority both generally and specifically with respect to certain regulations that could result in negative environmental impacts, inasmuch as a central purpose of Executive Law § 94-c is environmental concern. Initially, to the extent petitioners argue that the regulations exceeded ORES's authority under its enabling statute, said argument is wholly without merit given that the enabling act directed ORES to issue regulations "to implement the siting permit program established in [Executive Law 94-c]," including USCs (Executive Law § 94-c [3] [g]; see Executive Law § 94-c [3] [c], [e]. ORES simply fleshed out the details of the siting regimen and there is nothing ultra vires in this regard. Moving to petitioners' specific objections, they challenge ORES's statutory authority with respect to using the "deferral theory" — meaning that environmental impacts will be assessed at a later date by ORES pursuant to its regulations — arguing that it could lead to adverse environmental impacts in violation of not only SEQRA, but also Executive Law § 94-c. However, it is clear that ORES was mandated to enact regulations, which by definition will be individually and concretely applied for each particular application. Enacting these regulations is not part of a segmented or deferred review, but rather a pragmatically-based SEQRA review that is designed to review the regulations themselves, rather than review the future impacts of particular projects that are otherwise exempt from SEQRA. As to petitioner's additional argument, we are unpersuaded that the default provision contravened the express language of Executive Law § 94-c. To that end, Executive Law § 94-c (5) (f) sets the one-year time frame for reviewing applications; this time frame was then incorporated into the regulations (see 19 NYCRR 900-9.1 [a] [2]). The default provision ensures that permit decisions not linger in administrative purgatory, which is important given the ultimate goal of zero emissions of electrical energy by 2040 (see Public Service Law § 66-p [2] [b]).
We now turn to petitioners' multiple challenges to ORES's limited authority to preempt local laws in certain circumstances, known as the waiver provision. Initially, petitioners argue that the waiver provision, which allows case-by-case waivers of local zoning and land use laws when determined to be unreasonably burdensome, is ultra vires. We disagree inasmuch as this express language was used in the enabling statute (see Executive Law § 94-c [5] [e]; 19 NYCRR 900-2.25) and unreasonably burdensome local laws would thwart the ultimate goals of the legislation (see Public Service Law § 66-p).[FN4] Petitioners also argue that the waiver provision is unconstitutional under the home rule provision contained in [*8]article IX of the NY Constitution because the waiver provision allows ORES to "waive local laws on a case[-]by[-]case basis." NY Constitution, article IX, § 2 defines home rule powers of a local government, and section 2 (b) (2) provides that the legislature "[s]hall have the power to act in relation to the property, affairs or government of any local government only by general law, or by special law," subject to exceptions not relevant herein. General laws are those "which in terms and in effect appl[y] alike to all counties, all counties other than those wholly included within a city, all cities, all towns or all villages" (NY Const, art IX, § 3 [d] [1]). Local governments are authorized to regulate the use of land through enacting zoning laws (see Municipal Home Rule Law § 10 [4] [a]). "The doctrine of preemption, however, 'represents a fundamental limitation on home rule powers' " and "[t]he Legislature may expressly state its intent to preempt, or it may do so by implication" (Matter of Norse Energy Corp. USA v Town of Dryden, 108 AD3d 25, 31 [3d Dept 2013], affd 23 NY3d 728 [2014], quoting Albany Area Bldrs. Assn. v Town of Guilderland, 74 NY2d 372, 377 [1989]). In this respect, "[w]hile localities have been invested with substantial powers both by affirmative grant and by restriction on State powers in matters of local concern, the overriding limitation of the preemption doctrine embodies 'the untrammeled primacy of the Legislature to act with respect to matters of State concern' " (Albany Area Bldrs. Assn. v Town of Guilderland, 74 NY2d at 377 [ellipsis omitted], quoting Wambat Realty Corp. v State of New York, 41 NY2d 490, 497 [1977]).
Importantly, "where State interests are involved to a substantial degree, in depth or extent[,] the State may freely legislate without home rule approval, notwithstanding the legislation's impact on local concerns" (Matter of Citizens for Hudson Val. v New York State Bd. on Elec. Generation Siting & Envt., 281 AD2d 89, 95 [3d Dept 2001] [internal quotation marks and citations omitted]). Notably, this Court has determined that "comprehensive regulatory schemes relating to the siting of public utilities have been found to qualify as a 'general law' preempting local zoning ordinances" (id.; see Matter of TransGas Energy Sys., LLC v New York State Bd. on Elec. Generation Siting & Envt., 65 AD3d 1247, 1252 [2d Dept 2009], lv denied 13 NY3d 715 [2010]). This principle negates and forecloses petitioners' home rule challenge because ORES's preemption power is a general law, applying uniformly to all municipalities (see Executive Law § 94-c [5] [e]; [6] [a]),[FN5] and energy infrastructure siting is a matter of State concern (see Consolidated Edison Co. of N.Y. v Town of Red Hook, 60 NY2d 99, 107 [1983]; Matter of Citizens for Hudson Val. v New York State Bd. on Elec. Generation Siting & Envt., 281 AD2d at 95; County of Orange v Public Serv. Commn. of State of N.Y., 39 AD2d 311, 317 [2d Dept 1972], affd 31 NY2d 843 [1972[*9]]).
Likewise, petitioners' more specific claim that the language of the waiver provision fails to comport with the enabling act must be rejected. In particular, the waiver provision of the regulations incorporates language from the former Public Service Law article 10 regime and provides that, in considering a waiver, ORES may consider "technological limitations," "costs to consumers," or "the needs of consumers" (19 NYCRR 900-2.25 [c] [1]-[3]; compare 16 NYCRR 1001.31 [e]). Petitioners assert that this language is improper because Public Service Law article 10 provides a different standard for a waiver than Executive Law § 94-c, and that this last sentence has "no bearing on the standard for waiver under § 94-c." This, however, fails to recognize that agencies "can adopt regulations that go beyond the text of that legislation, provided they are not inconsistent with the statutory language or its underlying purposes" (Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib., 2 NY3d 249, 254 [2004]).
Finally, to the extent preserved, petitioners' challenge to the waiver provision on vagueness grounds also lacks merit. "A statute, or a regulation, is unconstitutionally vague if it fails to provide a person of ordinary intelligence with a reasonable opportunity to know what is prohibited, and it is written in a manner that permits or encourages arbitrary or discriminatory enforcement" (Ulster Home Care v Vacco, 96 NY2d 505, 509 [2001] [internal quotation marks and citations omitted], cert denied 534 US 1065 [2001]). Moreover, because petitioners pursue a facial challenge, they "must carry the heavy burden of showing that the [regulation] is impermissibly vague in all of its applications" (Matter of Independent Ins. Agents & Brokers of N.Y., Inc. v New York State Dept. of Fin. Servs., 39 NY3d 56, 64-65 [2022] [internal quotation marks and citations omitted]; see also People v Stuart, 100 NY2d 412, 421 [2003]). Here, the regulations specify that, pursuant to Executive Law § 94-c, ORES may preempt a local law only if ORES finds that such law is "unreasonably burdensome in view of the CLCPA [emission reduction] targets and the environmental benefits of the proposed [major renewable energy] facility" (19 NYCRR § 900-2.25 [c]), which we find to be adequate notice of when preemption may be appropriate. Petitioners are also incorrect in their claim that the regulations provide "no guidance" on how ORES will assess requests for waivers. To the contrary, the regulations specify what an applicant seeking a waiver must demonstrate, including the degree of burden caused by the local law requirement, that the requested waiver cannot reasonably be obviated by design changes to the facility, that the requested waiver is the minimum necessary and that the adverse impacts of granting the waiver shall be mitigated to the maximum extent practicable consistent with applicable requirements set forth in ORES regulations (see 19 NYCRR [*10]900-2.25 [c]). Thus, because the regulations provide ample guidance on what information ORES will consider when evaluating waiver requests and petitioners have failed to establish that the regulations are vague in every application, we conclude that they are not impermissibly vague on their face (see Matter of Independent Ins. Agents & Brokers of N.Y., Inc. v New York State Dept. of Fin. Servs., 39 NY3d at 69; see generally Sullivan v New York State Joint Commn. on Pub. Ethics, 207 AD3d 117, 129 [3d Dept 2022]). Petitioners' remaining contentions, to the extent not expressly addressed herein, have been evaluated and determined to be without merit.
Aarons, J.P., Reynolds Fitzgerald and McShan, JJ., concur.
ORDERED that the appeal from the order is dismissed, without costs.
ORDERED that the judgment is affirmed, without costs.

Footnotes

Footnote 1: The right to appeal from the order denying the motion for a preliminary injunction terminated upon entry of the final judgment dismissing the petition/compliant; thus, the appeal from the September 2021 order must be dismissed (see Matter of Granger Group v Town of Taghkanic, 77 AD3d 1137, 1139 n 5 [3d Dept 2010], lv denied 16 NY3d 781 [2011]). Although the appeal from the final judgment would bring this order up for review (see CPLR 5501 [a] [1]; Matter of Granger Group v Town of Taghkanic, 77 AD3d at 1139 n 5), petitioners have abandoned any issue with the order by failing to address it in their brief (see generally Matter of Grout v Visum Dev. Group LLC, 197 AD3d 1404, 1406 n [3d Dept 2021]).

Footnote 2: We note that it is circular to argue, on one hand, that the regulations are an action necessitating SEQRA review but, on the other hand, that the action could not be designated as a type I action by virtue of the fact that they are merely regulations.

Footnote 3: We find no merit to the assertion that ORES deferred its obligation to Tetra Tech.

Footnote 4: Petitioners' argument, based upon Matter of Frew Run Gravel Prods. v Town of Carroll (71 NY2d 126 [1987]) and its progeny, lacks merit as it is based upon their incorrect characterization that the waiver provision "impliedly preempts all local laws." Notably, respondents are not arguing that the limited waiver provision impliedly preempts all local laws. In fact, the limited preemption authority must be read within the context of the requirement that, as part of the permitting process, an applicant must attest that it complies with local laws or is seeking a waiver from same and what efforts it makes to comply with same (see Executive Law § 94-c [5] [c] [ii]; 19 NYCRR 900-1.3 [a] [3], [4], [5]).

Footnote 5: Although a general law applying to all municipalities, ORES must still assess whether to waive a local law on a case-by-case basis based upon the specific applications at issue (see 19 NYCRR 900-2.25). Notably, to balance ORES's preemption authority, the burden is on the applicant to demonstrate that a local law is unreasonably burdensome and request that it not be applied (see 19 NYCRR 900-1.3 [a] [4]; 19 NYCRR 900-2.25 [c]). Further, local municipalities may challenge the waiver and request adjudication (see 19 NYCRR 900-8.4 [d]).